# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

PUBLIC LANDS COUNCIL, a non-profit membership organization on behalf of its members; NATIONAL CATTLEMAN'S ASSOCIATION, a non-profit membership organization on behalf of its members; AMERICAN SHEEP INDUSTRY ASSOCIATION, a non-profit membership organization on behalf of its members; AMERICAN FARM BUREAU FEDERATION, a non-profit membership organization on behalf of its members; ASSOCIATION OF NATIONAL GRASSLANDS, a non-profit membership organization on behalf of its members,

            Plaintiffs - Appellees,

    v.

BRUCE BABBITT, UNITED STATES DEPARTMENT OF THE INTERIOR SECRETARY, in his official capacity; MICHAEL DOMBECK, ACTING DIRECTOR, U.S. BUREAU OF LAND MANAGEMENT, in his official capacity; INTERIOR DEPARTMENT; BUREAU OF LAND MANAGEMENT,

No. 96-8083

Defendants - Appellants.

_____

THE ARIZONA AND NEW MEXICO
COALITION OF COUNTIES FOR
STABLE ECONOMIC GROWTH; NEW
MEXICO PUBLIC LANDS COUNCIL;
BERT SMITH - OX RANCH; DESERT
LIVESTOCK PRODUCERS;
ALAMEDA CORPORATION and
OSCAR S. WYATT, JR.,

    Amici Curiae.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D. Ct. No. 95-CV-165-B)

Before **SEYMOUR,** Chief Judge, **PORFILIO,** and **TACHA,** Circuit Judges.

**ORDER ON REHEARING**
Filed February 8, 1999

The Secretary has petitioned the court for rehearing, requesting that it delete the highlighted portion of the following sentence as unnecessary to the court's holding and incorrect as a matter of law: "Congress intended that once the Secretary established a grazing district under the TGA, the primary use of that land should be grazing *unless the Secretary withdraws the land from grazing use in accordance with the withdrawal provisions of FLPMA. See 43 U.S.C. § 1714".* Slip op. at 56. In response, Public Lands

-2-

Council concedes that the statutory citation is incorrect but contends that we should cite a different statutory provision rather than remove the highlighted portion of the sentence.

Upon consideration, the court grants the limited petition for rehearing and orders the highlighted portion of the sentence removed from the court's opinion so that the sentence will read: "Congress intended that once the Secretary established a grazing district under the TGA, the primary use of that land should be grazing." An amended copy of the court's opinion is attached to this order.

ENTERED FOR THE COURT

Patrick Fisher, Clerk of Court

By: _____
                    Deputy Clerk

F I L E D
United States Court of Appeals
Tenth Circuit

FEB 8 1999

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

PUBLIC LANDS COUNCIL, a
non-profit membership organization
on behalf of its members; NATIONAL
CATTLEMAN'S ASSOCIATION, a
non-profit membership organization
on behalf of its members; AMERICAN
SHEEP INDUSTRY ASSOCIATION,
a non-profit membership organization
on behalf of its members; AMERICAN
FARM BUREAU FEDERATION, a
non-profit membership organization
on behalf of its members;
ASSOCIATION OF NATIONAL
GRASSLANDS, a non-profit
membership organization on behalf of
its members,

         Plaintiffs - Appellees,

    v.

BRUCE BABBITT, UNITED STATES
DEPARTMENT OF THE INTERIOR
SECRETARY, in his official capacity;
MICHAEL DOMBECK, ACTING
DIRECTOR, U.S. BUREAU OF
LAND MANAGEMENT, in his
official capacity; INTERIOR
DEPARTMENT; BUREAU OF LAND
MANAGEMENT,

No. 96-8083

Defendants - Appellants.

_____

THE ARIZONA AND NEW MEXICO
COALITION OF COUNTIES FOR
STABLE ECONOMIC GROWTH;
NEW MEXICO PUBLIC LANDS
COUNCIL; BERT SMITH - OX
RANCH; DESERT LIVESTOCK
PRODUCERS; ALAMEDA
CORPORATION and OSCAR S.
WYATT, JR.,

Amici Curiae.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D. Ct. No. 95-CV-165-B)

William B. Lazarus, Attorney, Department of Justice (Lois J. Schiffer, Assistant
Attorney General, Gary B. Randall, Attorney, John W. Watts, Attorney, and
Robert L. Klarquist, Attorney, Department of Justice, with him on the briefs),
Washington, DC, appearing for Defendant-Appellant.

Constance E. Brooks, C.E. Brooks & Associates, P.C., Denver, Colorado (Diane
Vaksdal Smith and Michael B. Marinovich, C.E. Brooks & Associates, P.C.,
Denver, Colorado, and Calvin E. Ragsdale, Marty & Ragsdale, Green River,
Wyoming, with her on the brief), appearing for Plaintiff-Appellee.

Before **SEYMOUR,** Chief Judge, **PORFILIO,** and **TACHA,** Circuit Judges.

**SEYMOUR,** Chief Judge.

- 2 -

The question before us on this appeal is whether the Secretary of the Interior acted within his authority under the Taylor Grazing Act of 1934 (TGA), 43 U.S.C. §§ 315 *et seq* ., the Federal Lands Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 *et seq* ., and the Public Rangelands Improvement Act of 1978 (PRIA), 43 U.S.C. §§ 1901 *et seq* ., when he promulgated new regulations governing the administration of livestock grazing on public lands managed by the Bureau of Land Management (BLM). Following publication of the final rules in 1995, the Public Lands Council along with several livestock industry groups (collectively PLC) brought suit in the district court challenging the facial validity of ten of the new regulations. The district court held four of the regulations invalid and enjoined their enforcement. The four regulations concerned: (1) the use of the terms "grazing preference" and "permitted use" to denote priorities and specify grazing use for purposes of issuing grazing permits (permitted use rule); (2) ownership of title to range improvements (range improvements rule); (3) the elimination of the requirement that applicants for permits must "be engaged in the livestock business" (qualifications rule); and (4) the issuance of permits for "conservation use" in addition to permits for the grazing of livestock (conservation use rule).

The Secretary appeals the district court's order enjoining enforcement of

the aforementioned regulations, asserting that the new rules do not conflict with the governing statutes and that the reviewing courts must therefore defer to the Secretary's rulemaking authority. For the reasons stated below, we reverse the district court's order holding invalid the permitted use rule, the range improvements rule, and the mandatory qualifications rule, and we affirm the district court's order holding invalid the conservation use rule.

# I

# BACKGROUND

## A.  The Controlling Statutes

Our review of the challenged 1995 grazing regulations is set against the backdrop of Congress' enacted policy regarding administration of the public lands. The Secretary of the Interior, through the BLM, manages approximately 170 million acres of public rangelands throughout the western United States as guided and constrained by the TGA, FLPMA, and PRIA. We therefore begin with an overview of those statutes.

### 1.  *The Taylor Grazing Act*

Until 1934, the federal government left unregulated the administration of

millions of acres of unappropriated public lands in the western states, including Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming.  In response to damage to the public rangelands caused by decades of unregulated livestock grazing, Congress enacted the Taylor Grazing Act, establishing a threefold legislative goal:  to regulate the occupancy and use of the federal lands, to preserve the land and its resources from injury due to overgrazing, and "to provide for the orderly use, improvement, and development of the range."  43 U.S.C. § 315a.  One of the key issues the Act was intended to address was the need to stabilize the livestock industry by preserving ranchers' access to the federal lands in a manner that would guard the land against destruction.   See Taylor Grazing Act, ch. 865, 48 Stat. 1269 (June 28, 1934).

In order to accomplish these purposes, Congress provided for the issuance of grazing permits under the supervision of the Secretary of the Interior, authorizing the Secretary to identify lands "chiefly valuable for grazing and raising forage crops," 43 U.S.C. § 315, to place these lands in "grazing districts," id., and to issue permits within the districts or grant leases outside the districts to "settlers, residents, and other stock owners" to graze livestock,       id. §§ 315, 315b, 315m.  The TGA also authorizes the Secretary to allow permittees to install range improvements on their grazing allotments and provides that new permittees must

pay reasonable value as determined by the Secretary for range improvements "constructed and owned" by a prior occupant. Id. § 315c.

In addition, Congress granted the Secretary broad discretionary authority to balance the interests of those who wish to use the government's land against the need to protect the land from injury. The TGA commands the Secretary to "make such rules and regulations and establish such service, enter into such cooperative agreements, and do any and all things necessary to accomplish the purposes" of the Act. Id. § 315a. The TGA further directs the Secretary to give renewal preference to those already holding permits, and to "adequately safeguard[]" the grazing privileges he recognizes, "[s]o far as consistent with the purposes and provisions" of the Act. Id. § 315b.

### 2. *The Federal Land Policy and Management Act*

Enacted in 1976, FLPMA represents Congress' express recognition that in over forty years of land management under the TGA, the BLM had failed adequately to protect and enhance the federal lands. See 43 U.S.C. § 1751(b)(1) ("Congress finds that a substantial amount of the Federal range lands is deteriorating in quality . . . ."); H.R. REP. NO. 94-1163, at 1 (1976), reprinted in 1976 U.S.C.C.A.N. 6175 ("[I]n many instances [public land laws] are obsolete and, in total, do not add up to a coherent expression of Congressional policies adequate for today's national goals."). Owing to the TGA's apparent

deficiencies, FLPMA instructs the Secretary to "manage [through BLM] the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). "Multiple use" requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage. Id. § 1702(c). "Sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." Id. § 1702(h).

In order to manage the lands in accordance with the principles of multiple use and sustained yield, FLPMA requires land use planning:

> The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands. *Land use plans shall be developed for the public lands regardless of whether such lands previously have been classified, withdrawn, or set aside, or otherwise designated for one or more uses.*

Id. § 1712(a) (emphasis added). In keeping with this mandate, FLPMA contains several provisions specific to livestock grazing which chiefly provide that all grazing permits must be issued subject to terms and conditions consistent with FLPMA. Id. § 1752.

### 3. *The Public Rangelands Improvement Act of 1978*

Congress enacted PRIA in 1978. Among its purposes was to reaffirm "a national policy and commitment to: . . . manage, maintain, and improve the condition of the public rangelands so that they become as productive as feasible for all rangeland values." 43 U.S.C. § 1901(b)(2). PRIA set forth Congressional findings that vast segments of the public rangelands remained in an unsatisfactory condition and that increased management and funding were needed to address the problem. See id. § 1901(a)(1)-(3). One of PRIA's primary effects was to implement a new grazing fee formula for domestic livestock grazing on the public rangelands. See id. § 1905; see also BUREAU OF LAND MANAGEMENT, U.S. DEP'T OF THE INTERIOR, THE TAYLOR GRAZING ACT: FIFTY YEARS OF PROGRESS, 1934-1984, at 5 (noting Congress' failure to appropriate millions of dollars authorized by PRIA).

## B. The 1995 Regulations

The 1995 grazing regulations made a number of changes to the administration of the then-existing federal grazing program.[1] We address below only those regulations held invalid by the district court.

### 1. *Permitted Use Rule*

---

[1]As is customary with adminstrative regulations, the regulations implementing and enforcing the TGA, FLPMA, and PRIA have been amended on several occasions since 1934, as we discuss *infra*.

As part of the scheme for issuing grazing permits and determining grazing levels, the rangeland management rules in effect prior to 1995 employed the term "grazing preference" to mean "the total number of animal unit months [AUMs] of livestock grazing on public lands apportioned and attached to base property owned or controlled by the permittee or lessee." 43 C.F.R. § 4100.0-5 (1994). One AUM represents the amount of forage necessary to sustain one cow or horse or five sheep or goats for one month. Id. This "grazing preference" included "active use," defined as "the current authorized livestock grazing use," id., which was adjusted according to rangeland conditions and was "based upon the amount of forage available for livestock grazing established in the land use plan," id. § 4110.2-2(a), as well as "suspended use," id., which could be converted to active use should the rangeland's carrying capacity increase. The "grazing preference" was specified in all grazing permits or leases issued by the Secretary, id.; was attached to base property, id. § 4110.2-2(c); and was transferable with the base property in whole or in part upon application and approval, id. § 4110.2-3.

The 1995 regulations redefined the term "grazing preference" to mean "a superior or priority position against others for the purpose of receiving a grazing permit or lease," which is "attached to base property owned or controlled by the permittee or lessee." 43 C.F.R. § 4100.0-5 (1995). At the same time, BLM added

-9-

the term "permitted use," defined as "the forage [expressed in AUMs] allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease." Id. "Permitted use" encompasses both active and suspended use. Id. § 4110.2-2(a). Like "grazing preference" in the previous rules, "permitted use" is specified in permits as a designated amount of forage expressed in AUMs, id.; is attached to base property, id. § 4110.2-2(c); and is transferable with the base property in whole or in part upon application and approval, id. § 4110.2-3.

## 2. *Range Improvements Rule*

Prior to 1995, BLM's regulations provided that title to many range improvements constructed under cooperative agreements upon application and approval by the Secretary, including fences, wells and pipelines, was "shared by the United States and cooperator(s) in proportion to the actual amount of the respective contribution to the initial construction." 43 C.F.R. § 4120.3-2 (1994).

Under the 1995 regulations, the government prospectively asserts title to "permanent" range improvements, such as fences, wells, reservoirs, pipelines, and stock tanks, and "non-structural" improvements such as seeding, spraying, and chaining, authorized after August 21, 1995. 43 C.F.R. § 4120.3-2 (1995). Specifically, the new regulations provide that all permanent improvements will be

-10-

constructed under cooperative agreements between the permittees and BLM, and that all improvements constructed under such cooperative agreements will be titled in the government.    Id. § 4120.3-2(b).  As under the previous scheme, the 1995 regulations provide for compensation to permittees for existing or future range improvements, requiring new permit applicants or transferees to pay the prior occupants for their "interest in the authorized improvements within the allotment as of the date of transfer."    Id. § 4120.3-5.

### 3. *Qualifications Rule*

Under the previous regulations, in addition to owning or controlling base property used in a livestock operation, permit applicants were required to "be engaged in the livestock business."  43 C.F.R. § 4110.1 (1994).  The new qualifications rule eliminates this requirement.    See 43 C.F.R. § 4110.1 (1995). The new rule was devised to "clarify that mortgage insurers, natural resource conservation organizations, and private parties whose primary source of income is not the livestock business, but who meet the [other criteria], are qualified for a grazing permit or lease."  Department Hearings and Appellate Procedures; Cooperative Relations; Grazing Administration; Exclusive of Alaska; Final Rule, 60 Fed. Reg. 9894, 9901 (1995) (hereinafter Final Rule).  The new regulations also altered the definition of "base property,"    see 43 C.F.R. § 4100.0-5 (1995), to

-11-

"clarify that base property must be capable of serving as a base for livestock operations but it need not actually be in use for livestock production," 60 Fed. Reg. at 9901.

**4.** *Conservation Use Rule*

The 1995 regulations added "conservation use" as a permissible use of a grazing permit. See 43 C.F.R. § 4100.0-5 (1995) (defining "grazing permit" as a document that specifies "all authorized use [of public lands within a grazing district] including livestock grazing, suspended use, and conservation use"). "Conservation use" means "an activity, excluding livestock grazing, on all or a portion of an allotment" for the purpose of protecting the land and its resources, improving rangeland conditions, or enhancing resource values. Id. Conservation use may be approved for a period of up to ten years–i.e., for the entire duration of the permit. See id. § 4130.2(g)(1). According to the Secretary, conservation use will be initiated by request of the permittee and will *not* be forced on an unwilling permittee. See Final Rule, 60 Fed. Reg. at 9898. Allotments in conservation use will not be subject to grazing fees since no forage will be consumed by livestock. See id. BLM will not consider allowing another operator to use any resulting forage. See id.

As under the old rules, the 1995 regulations provide that BLM can

temporarily suspend grazing for conservation reasons. See 43 C.F.R. §§ 4110.3-2 to -3 (1995) (describing procedures for reducing permitted use). In addition, the new regulations add the term "temporary nonuse" to describe "the authorized withholding, on an annual basis, of all or a portion of permitted livestock use" at the request of a permittee. Id. § 4100.0-5. Temporary nonuse allows a permittee to place all or part of his "permitted use" in nonuse for up to three years for "reasons including but not limited to financial conditions or annual fluctuations of livestock." Id. § 4130.2(g)(2).

## C. PLC's Challenge

Soon after the Secretary's proposed regulations took effect on August 21, 1995, PLC filed suit in the United States District Court for the District of Wyoming, challenging the facial validity of several of the new regulations. PLC later substituted a petition for review, seeking declaratory and injunctive relief on the same grounds stated in its complaint. PLC challenged most of the regulations on the grounds that the Secretary had exceeded his statutory authority, lacked a reasoned basis for departing from previous rules, or had failed to provide adequate responses to public comments. PLC also challenged two of the new regulations on constitutional grounds and asserted that the Final Environmental Impact Statement violated the National Environmental Policy Act, 42 U.S.C.

§§ 4321 et seq.

On June 13, 1996, the district court entered an Order on Petition for Review, holding in favor of PLC on four of the challenged regulations. See Public Lands Council v. Department of the Interior, 929 F.Supp. 1436 (D. Wyo. 1996). The district court characterized the permitted use rule as ending longstanding recognition of grazing preferences adjudicated following enactment of the TGA, thereby depriving permittees of their statutory "right" to graze predictable numbers of stock. As such, the court held the permitted use rule violates the TGA's mandate that "grazing privileges recognized and acknowledged shall be adequately safeguarded." Id. at 1440-41. In addition, the district court interpreted the TGA to require that range improvements be owned by the permittees who construct them, and held that the 1995 range improvements regulation violates this requirement. See id. at 1442-43. Finally, the district court held that eliminating the requirement that permit applicants be engaged in the livestock business violates the TGA's mandate that preference be given to such persons, see id. at 1444-45; and that the Secretary exceeded his authority under the TGA and FLPMA and lacked a reasoned basis in authorizing BLM to issue "conservation use" permits, see id. at 1443-44. The district court held in favor of the government on the remaining challenges to other parts of the new regulations, and the PLC does not contest these rulings on appeal.

-14-

**D. Standard of Review**

We review <u>de novo</u> a district court's decision regarding an agency action. <u>See</u> <u>Santa Fe Energy Prod. Co. v. McCutcheon</u>, 90 F.3d 409, 413 (10th Cir. 1996) (standard of review of agency action identical in both district and appellate court; "[o]nce appealed, the district court's decision is afforded no particular deference").

Our role as a reviewing court addressing PLC's facial challenge to the 1995 regulations is well established. Under section 706 of the Administrative Procedures Act (APA), 5 U.S.C. § 706, we cannot set aside any agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," <u>id</u>. § 706(2)(A), or unless it is "in excess of statutory jurisdiction, authority, or limitations, or short of a statutory right." <u>Id</u>. § 706(2)(C). <u>See</u> <u>Olenhouse v. Commodity Credit Corp.</u>, 42 F.3d 1560, 1574 (10th Cir. 1994) ("[T]he essential function of judicial review is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion.") (citations omitted). Moreover, because PLC has challenged the 1995 regulations on their face and seeks to enjoin their enforcement, our review is also governed by the standard applicable to facial challenges. To prevail on a facial challenge, PLC "'must

-15-

establish that no set of circumstances exists under which the [regulation] would be valid.'" Reno v. Flores, 507 U.S. 292, 301 (1993) (alteration in original) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)).

Our review is also guided by the principles governing judicial review of agency action set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984).

> In determining whether an administrative regulation permissibly construes the statute that an agency is charged with enforcing, our inquiry is shaped by the specificity of the Congressional enactment:
>
> "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Quivira Mining Co. v. Nuclear Regulatory Comm'n, 866 F.2d 1246, 1249 (10th Cir. 1989) (quoting Chevron, 467 U.S. at 842-43).

Even under Chevron's second step, however, "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." MCI Telecomm. Corp. v. AT&T, 512 U.S. 218, 229 (1994); see Southern Ute Indian Tribe v. Amoco Prod. Co., 119 F.3d 816, 835 (10th Cir.

1997) ("Even under the deference mandated by Chevron, 'legislative regulations are [not] given controlling weight [if] they are arbitrary, capricious, or manifestly contrary to the statute.'") (alterations in original) (quoting Chevron, 467 U.S. at 844), aff'd en banc on other grounds, No. 94-1579, 1998 WL 404549 (10th Cir. July 20, 1998). "[N]o deference is warranted if the interpretation is inconsistent with the legislative intent reflected in the language and structure of the statute or if there are other compelling indications that it is wrong." Mountain Side Mobile Estates Partnership v. Secretary of Housing & Urban Dev., 56 F.3d 1243, 1248 (10th Cir. 1995) (citation omitted).

With this standard of review in mind, we turn to an examination of the regulations invalidated by the district court. In doing so, we note at the outset that Congress and the various Secretaries of the Interior have developed over the last sixty years a somewhat complicated regulatory scheme governing the federal lands. Yet this complicated scheme stems from a simple premise: the lands at issue here belong to the United States government; the issuance of grazing permits "shall not create any right, title, interest, or estate in or to the lands." 43 U.S.C. § 315b. Congress passed the aforementioned statutes governing when and how private individuals will be allowed to use those lands and charged the Secretary of the Interior with enforcing its intentions. We must therefore ask and answer the simple question whether the Secretary's regulations are consistent with

-17-

the authority Congress has given him, or whether they conflict with Congress'
*unambiguous* commands.

## II.

## THE PERMITTED USE RULE

Upon examining the relevant statutes, regulations, and the record, we are persuaded the permitted use rule comports with the authority granted the Secretary of the Interior under the TGA and FLPMA and demands our deference under Chevron.

In invalidating the permitted use rule, the district court held that the Secretary's decision to change the definition of "grazing preference" and to add the concept of "permitted use," whereby the terms and conditions specified in all grazing permits are determined in accordance with land use plans, ended the prior practice of "recognizing" the grazing preferences allocated following the TGA's passage in 1934. According to the district court, this failure to recognize the original grazing adjudications eliminated an important "right" granted by the TGA – the right to graze predictable numbers of stock from permit to permit. In eliminating this "right," the Secretary necessarily failed to "adequately safeguard[]" it as required by the TGA. The dissent adopts this characterization

of the TGA and the existing regulations.  An examination of the controlling statutes in light of the relevant regulations developed over the years to implement them, however, reveals that the permitted use rule neither conflicts with an unambiguous statutory command nor eliminates any long-recognized right accorded permittees to graze predictable numbers of stock.

To place the 1995 permitted use rule in context, and to respond to the dissent's erroneous characterization of the regulatory scheme that obtained under the TGA and FLPMA prior to 1995, we begin with a discussion of earlier versions of BLM's regulations governing issuance of grazing permits.  We follow with an analysis of the changes posed by the permitted use rule.  We then explain how a close reading of the statutory language of the TGA and FLPMA mandates our ultimate conclusion that the Secretary of the Interior acted within his authority in issuing the permitted use rule.

## A.    The Regulatory Scheme

### 1.  *The Federal Range Code* [2]

After enactment of the TGA in 1934, the Secretary of the Interior began the process of establishing grazing districts, issuing permits, and granting leases.  At

---

[2]The "Range Code" was a shorthand method of referring to the regulations governing grazing activity under the TGA, and its use disappeared completely in the 1978 revisions.  See generally Delmar & Jo McLean v. Bureau of Land Management, 133 IBLA 225, 241 n.8 (Aug. 3, 1995).

the time of the TGA's passage, the number of qualifying applicants far exceeded the amount of grazing land available to accommodate them. Therefore, the Department of the Interior (DOI) instituted a detailed adjudication process, guided by a set of priorities articulated in section three of the TGA, to determine which applicants would receive grazing permits. First priority in the issuance of permits went to applicants who owned land or water, i.e., "base property," in or near a grazing district, who were dependent on the public lands for grazing, who had used their land or water for livestock operations in connection with the public lands in the five years preceding the TGA's enactment, and whose land or water was situated so as to require the use of public rangeland for "economic" livestock operations. See DIVISION OF GRAZING, U.S. DEP'T OF THE INTERIOR, FEDERAL RANGE CODE, §§ 2(g)-(h), 4(a), 6(b)(1) (1938). Once the Secretary issued a favorable grazing decision regarding an individual applicant, the applicant received a ten-year permit which specified the maximum number of livestock, measured in AUMs, that the permittee was entitled to place in a grazing district.

2. *The 1978 Regulations*

As discussed above, Congress enacted FLPMA in 1976 to address the continued deterioration of federal rangelands that was occurring in spite of the Taylor Grazing Act. "The Federal Land Policy & Management Act of 1976 . . .

-20-

was a comprehensive statement of the public policy of the United States, declaring that public lands be systematically inventoried and subjected to a land use planning process which would enable them to be managed by the Secretary of the Interior . . . ."  <u>Natural Resources Defense Council, Inc. v. Hodel</u>, 618 F.Supp. 845, 857 (E.D. Cal. 1985).  In 1978, the Secretary issued new regulations under FLPMA governing grazing administration, which effected significant changes in the process for issuing grazing permits.  <u>See</u> Bruce M. Pendery, *Reforming Livestock Grazing on the Public Domain: Ecosystem Management-Based Standards & Guidelines Blaze a New Path for Range Management*, 27 ENVTL. L. 513, 556 (1997) ("Over the years, the Range Code was 'amended as the occasion arose.'  But when FLPMA was enacted in 1976, sweeping revisions of the regulations were made.") (quoting George C. Coggins & Margaret Lindberg-Johnson, *The Law of Public Rangeland Management II: The Commons & The Taylor Act*, 13 ENVTL. L. 1, 69 (1982) (footnote omitted)).  At the outset, and in recognition of the gravity of the changes, the Secretary made provisions for the livestock operators already authorized to use the federal lands:

> Serious concern was expressed in several of the comments about how these grazing regulations will affect the livestock operators now authorized to graze on the public lands administered by the Bureau of Land Management.  Livestock operators with a grazing license, permit, or lease will be recognized as having a preference for continued grazing use on these lands.  There [sic] adjudicated grazing use, their base properties, and their areas of use (allotments) will be recognized under these grazing regulations.

43 Fed. Reg. 29,058 (July 5, 1978).

While the previously adjudicated grazing uses were to be recognized for the length of existing permits, "future adjudications of grazing use would be based on criteria vastly different than those provided in the Federal Range Code." <u>Delmer & Jo McLean v. Bureau of Land Management</u>, 133 IBLA 225, 233 (Aug. 3, 1995). The 1978 regulations specified that "[l]ivestock grazing permits and leases *shall* contain terms and conditions necessary to achieve the management objectives for the public lands . . . *identified in land use plans*." 43 C.F.R. § 4120.2 (1978) (emphasis added). Grazing permits or leases issued under the regulations were subject to the following mandatory terms and conditions:

> (a) *The authorized officer shall specify* the kind and number of livestock, the period(s) of use, the allotment(s) to be used, and *the amount of use, in animal unit months, that can be made in every grazing permit or lease*. The authorized livestock *grazing use* shall not exceed the livestock grazing capacity and *shall be limited or excluded to the extent necessary to achieve the objectives established for the allotment*.

> (b) If it has been determined that allotment management plans are not necessary, or if allotment management plans have not been implemented where they are needed, *the authorized officer shall incorporate terms and conditions under this section in grazing permits or leases*. *The authorized officer shall modify these terms and conditions if the condition of the range requires modification of grazing use and may cancel grazing permits or grazing leases and grazing preferences as conditions warrant. These modifications and cancellations may be made at any time* and shall be put into full force and effect on the date specified by the authorized officer.

Id. § 4120.2-1 (emphasis added). The regulations made cancellation of grazing preferences mandatory when necessary to maintain compliance with land use plans: "When authorized grazing use exceeds the amount of forage available . . . or where reduced grazing is necessary to facilitate achieving the objectives in the land use plans, grazing permits or grazing leases and grazing preferences *shall* be canceled in whole or in part." Id. § 4110.3-2(b) (emphasis added).

Grazing permits were offered "for a term not to exceed 10 years to qualified applicants." Id. § 4130.2(a). Permits were to "include appropriate terms and conditions," id. § 4130.2(b), were to be "modified or canceled in accordance with land use planning decisions," id. § 4130.2(d)(3), and were to be subject to annual review "and modification of terms and conditions as appropriate," id. § 4130.2(d)(4). Most significant for purposes of this appeal, the permit renewal process provided as follows: "Permittees or lessees holding expiring grazing permits or leases shall be given first priority for receipt of new permits or leases *if* : . . . *[t]he permittee or lessee accepts the terms and conditions to be included in the new permit or lease by the authorized officer* . Id. § 4130.2(e)(3) (emphasis added).

According to the plain language of the regulation, the renewal of permits was subject to a preference right in the sense that permit holders had priority to renew their permits. However, it is equally clear that new terms and conditions --

-23-

including the numbers of stock permitted to graze -- could be specified by the authorizing officer in such new permits and that any terms and conditions specified were required to be in accord with applicable land use plans. Nowhere in the 1978 regulations was there any requirement, or even the suggestion, that the authorizing officer must recognize or refer to the original grazing adjudications, or even the most recent adjudications, in issuing new permits.

### 3. *The post-1978 regulations*.

As the drafters of FLPMA envisioned, managing the federal lands through land use planning is a dynamic process that has often led the various Secretaries of Interior to alter the governing regulations. See H.R. REP. NO. 94-1163, at 5 (1976), reprinted in 1976 U.S.C.C.A.N. 6175, 6179 (the BLM and the Forest Service "treat land use planning as dynamic and subject to change with changing conditions and values"). By 1994, many aspects of the original 1978 regulations had been altered, effectively softening the requirement that grazing preferences must at all times be consistent with land use plans. The 1978 regulations specified that terms and conditions should be modified or canceled "if the condition of the range requires modification of grazing use . . . at any time." 43 C.F.R. 4120.2-1(b) (1978). However, the regulations in effect in 1994 specified that the authorized officer "*may* make changes," which were required to be

-24-

"supported by monitoring, as evidenced by rangeland studies conducted over time, *unless the change is either specified in an applicable land use plan or necessary to manage, maintain or improve rangeland productivity*." 43 C.F.R. § 4110.3 (1994) (emphasis added). Whereas the 1978 regulations required livestock grazing permits to contain terms and conditions "identified in land use plans," 43 C.F.R. § 4120.2 (1978), the 1994 version merely stated: "Livestock grazing permits and leases shall contain terms and conditions necessary to achieve the management objectives for the public lands and other lands under Bureau of Land Management administration," 43 C.F.R. § 4130.6 (1994).

Yet despite the changes from 1978, the primacy of the land use plans mandated by FLPMA remained apparent in the fact that changes specified in land use plans did not require other justification. Most significantly, the provisions for permit renewal remained exactly the same as they had been in 1978, that is, permits were renewable so long as "the permittee or lessee accepts the terms and conditions to be included by the authorized officer in the new permit or lease." Id. § 4130.2. Once again, the regulations effective in 1994 offer no hint that recognition of or reference to the original grazing adjudications was in any way required. The authorized officer was clearly empowered to specify the terms and conditions -- including the numbers of stock and seasons of use -- upon the renewal of grazing permits in accordance with land use plans.

## 4. *The 1995 regulations*

As explained above, the 1995 regulations challenged here divided the concept previously known as the "grazing preference" into two parts, defining "preference" as a priority position against others for purposes of permit renewal and defining "permitted use" as "the forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease and . . . expressed in AUMs." 43 C.F.R. § 4100.0-5 (1995). It is apparent that one of the Secretary's purposes in promulgating the new regulations was to return to the position taken in the 1978 regulations under which the terms and conditions of a grazing permit *must* rather than *may* conform to land use plans. Nevertheless, changes in "permitted use" under the 1995 regulations, while mandatory if out of line with applicable land use plans, are in some respects more difficult to effect than under the 1994 regulations. Under the 1995 regulations *all* changes, even those specified in a land use plan, "must be supported by monitoring, field observations, ecological site inventory or other data acceptable to the authorized officer." Id. § 4110.3. Virtually all other aspects of the regulations governing permit issuance are identical to those

-26-

obtaining in 1994. [3]

The district court and the dissent believe the 1995 regulations somehow "eliminated" all reference to the original grazing adjudications "recognized" under the pre-1995 regulations. This assertion, of course, begs the question of exactly where this prior recognition can be found. The dissent attempts to find it in its own "historical understanding of grazing preferences and the importance that they assumed in the operation of permittes' livestock businesses." Dissent at 7. Without citation to any authority, the dissent then describes at length a process whereby the Secretary made permit renewal decisions by "reference to" or in "recognition of" the original grazing adjudications. Dissent at 6-10.

We know of no principle of administrative law that allows us to substitute our own unattributed assertions for the plain meaning of the regulations in seeking to review a regulatory scheme. We must therefore focus on the language of the regulations. As the preceding discussion demonstrates, since 1978 the number of AUMs allowed to graze on public lands has been specified by the Secretary upon the issuance of grazing permits in accordance with land use plans. At the close of the ten-year permit period, permit holders have first priority of

---

[3]The new regulations at several points mandate that all grazing permits and leases are to contain such terms and conditions necessary to conform with the new Subpart 4180, entitled "Fundamentals of Rangeland Health and Standards and Guidelines for Grazing Administration." The district court upheld this portion of the new regulations and its validity is not at issue in this appeal.

-27-

renewal subject to the terms and conditions specified by the Secretary in accordance with land use plans. Although it may well be the case that there were long periods in which the Secretary did not exercise his authority to change the permitted number of AUMs in new permits, [4] this practice did not rise to the level of a regulatory mandate.

Because the Secretary has long had the authority to specify permitted grazing use upon the renewal of a grazing permit, the district court erred in characterizing the permitted use rule as deviating from past regulations by eliminating all recognition of the original grazing adjudications. To the extent the original adjudications affected the substance of future grazing permits, they were not "recognized" in the manner asserted by the dissent under any regulations promulgated since the enactment of FLPMA.

## B. The Controlling Statutes

We now assess whether the permitted use rule is consistent with the statutory mandates set forth in the TGA and FLPMA.

### 1. *TGA*

Under the 1995 permitted use rule, "[p]ermitted use is granted to holders

---

[4]For example, during the 1980s, the BLM adopted a moratorium on grazing reductions unless a need for such reductions was indicated by certain data. See Pendery, supra, at 557 & n.345.

of grazing preference and shall be specified in all grazing permits and leases."

43 C.F.R. § 4110.2-2(a) (1995). Nothing in the TGA precludes the Secretary

from promulgating this regulation. The TGA provides in relevant part:

> [Grazing permits] shall be for a period of not more than ten years, subject to the *preference right of the permittees to renewal in the discretion of the Secretary of the Interior, who shall specify from time to time numbers of stock and seasons of use. . . . So far as consistent with the purposes and provisions of this subchapter*, grazing privileges recognized and acknowledged shall be *adequately* safeguarded, but the creation of a grazing district or the issuance of a permit pursuant to the provisions of this subchapter *shall not create any right, title, interest or estate in or to the lands*.

43 U.S.C. § 315b (emphasis added). The language of section 315b clearly does

not specify the "privileges" a grazing permit entails other than a general

authorization to graze livestock for a certain period of time not to exceed ten

years and a preferential right of renewal as a priority position against other permit

applicants, which is encompassed in the new definition of "grazing preference."

Moreover, the statute specifically provides that part of the Secretary's authority in

issuing permits is "to specify from time to time the numbers of stock and seasons

of use," which is exactly what the permitted use rule does.

The permitted use rule is also consistent with the underlying purposes of

the TGA. While stabilizing the livestock industry is one of several purposes of

-29-

the Act, PLC and the dissent place far too much weight on this point.[5]  The Act

clearly states that the need for stability must be balanced against the need to

protect the rangeland.  See id. § 315a.  The lack of mandatory terms in the statute,

together with the discretion vested in the Secretary of Interior, make clear that it

is the Secretary who is charged with striking that balance as he sees fit.  See 43

U.S.C. § 315a (Secretary empowered to do "any and all things necessary to

accomplish the purposes of this subchapter"); Natural Resources Defense Council,

Inc. v. Hodel, 624 F. Supp. 1045, 1058 (D. Nev. 1985) (general clauses and

phrases in statute are not concrete limits on agency authority).

------------------------------------------

[5]Indeed, the Act treats stabilizing the livestock industry as a secondary goal.
While this purpose is the third of several set out in the Act's uncodified preamble, the
actual text of the statute references only safeguarding the rangeland and providing for its
orderly use as primary objectives.  See 43 U.S.C. § 315a ("The Secretary of the Interior
shall . . . *do any and all things necessary* to accomplish the purposes of this subchapter,
and to insure the objects of such grazing districts, namely, to regulate their occupancy
and use, *to preserve the land and its resources from destruction or unnecessary injury,
[and] to provide for the orderly use, improvement, and development of the range*.")
(emphasis added).  Authorities in environmental law have observed that "[t]he one
explicit theme recurring throughout the statute is the need for improvement of range
conditions."  Coggins & Lindberg-Johnson, supra, at 50-51.
    Moreover, it is significant that BLM lands support only a small portion of the
livestock industry.  "[L]ivestock producers with Forest Service or BLM grazing permits
constitute a small percentage of all livestock producers, even in the West.  Only twenty-
two percent of western beef cattle producers have federal grazing permits.  Similarly,
only nineteen percent of western sheep producers hold federal grazing permits.  Thus,
even in the West only about one in five livestock producers holds a federal grazing
permit."  Pendery, supra, at 523 (footnotes omitted).  The Secretary is free to consider
this fact in balancing the need for industry stability against the need to protect the federal
lands from deterioration.

We are not persuaded by the assertion that the TGA unambiguously precludes the permitted use rule by requiring recognition of the original grazing adjudications and thus the right to graze predictable numbers of stock. The TGA gives no hint, much less the unambiguous direction required by <u>Chevron</u>, that the issuance of a grazing permit by the Secretary requires permanent "recognition" of the numbers of stock authorized to graze in that permit. The dissent's attempt to find such a mandate in the command that "grazing privileges recognized and acknowledged shall be adequately safeguarded" is unavailing. In the dissent's view, the number of AUMs assigned to permits in the original grazing decisions results in "recognized and acknowledged" grazing privileges. Even if this were true, the statute does not provide unconditionally that grazing privileges shall always be "adequately safeguarded." Rather, such privileges will be adequately safeguarded *as long as they are consistent with the purposes and provisions of the TGA*, namely protecting the federal rangelands and ensuring their orderly use. 43 U.S.C. § 315b.[6]

In this regard, the notion that the statute recognizes rights to graze set

---

[6]The dissent says that we "do[] not accord the statutory language much, if any, importance." Dissent at 1. To the contrary, we find the statutory language to be of primary importance and note that the dissent here fails to explain how its interpretation of the TGA as requiring permanent recognition of the original grazing adjudications can be reconciled with the clear statement that any privileges the Secretary recognizes are to be so recognized only so far as consistent with the purposes and provisions of the Act.

numbers of stock is itself in direct conflict with the statutory mandate that the Secretary *shall* specify the numbers and stock and seasons of use *from time to time*. See id. Perpetuating grazing decisions handed down in the 1940s may well be inconsistent with the ongoing statutory command that the Secretary protect the federal lands, especially where the grazing decisions were largely made by the ranchers themselves.[7] In addition, the dissent's suggestion that Congress meant the numbers of stock set by the original grazing decisions to become an ongoing "grazing preference" appears to conflict with the statute's provision of permit periods not to exceed ten years. The mandatory renewal process contemplates that the *substance* of the grazing privilege, as opposed to the *preference right of renewal*, is to be periodically adjusted in accordance with the condition of the rangeland.

## 2. *FLPMA*

The Secretary's power to regulate grazing under the TGA must be read in conjunction with FLPMA, which represents Congress' recognition that previously enacted laws governing use of the federal lands had failed to provide adequately for their protection and enhancement. FLPMA provides that "goals and

___

[7]"Between 1934 and 1976, grazing regulation was limited, and the early regulations were actually the creation of the ranchers themselves." Pendery, supra, at 521 (citing Coggins & Lindeberg-Johnson, supra, at 55-60).

objectives be established by law as guidelines for public land use planning, and that management be on the basis of multiple use and sustained yield unless otherwise specified by law." 43 U.S.C. § 1701(a)(7); see also id. § 1732(a) ("The Secretary shall manage the public lands under principles of multiple use and sustained yield. . . ."). In addition,

> the public lands [must] be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; that will provide for outdoor recreation and human occupancy and use. . . .

Id. § 1701(a)(8). In other words, FLPMA requires that the public lands be managed for many purposes in addition to grazing and for many members of the public in addition to the livestock industry.

As noted above, in order to manage the lands in accordance with principles of multiple use and sustained yield, FLPMA mandates that "[l]and use plans shall be developed for the public lands regardless of whether such lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses." Id. § 1712(a) (emphasis added). As part of the land use planning process, FLPMA sets forth a detailed set of requirements governing the issuance by the Secretary of livestock grazing permits. All livestock grazing permits are issued subject to terms and conditions consistent with statutory purposes. Id.

§ 1752. FLPMA also requires the Secretary to specify the numbers of animals to be grazed and seasons of use in all permits issued, either directly or by reference to an appropriate allotment management plan (AMP). See Natural Resources Defense Council, Inc., 618 F.Supp. at 858-59 (holding permit issuance requirements are "very specific" and describing AMPs as "'basically land use plans tailored to specific grazing permits.'") (quoting George C. Coggins, *The Law of the Public Rangeland IV: FLPMA, PRIA, and the Multiple Use Mandate,* 14 ENVTL. L. 1, 24 (1983)).[8]   The statute thus provides in relevant part:

(a) Terms and conditions

Except as provided in subsection (b) of this section, permits and leases for domestic livestock grazing on public lands issued by the Secretary . . . shall be for a term of ten years *subject to such terms and conditions the Secretary concerned deems appropriate and consistent with the governing law*, including, but not limited to, the authority of the Secretary concerned to cancel, suspend, or modify a grazing permit or lease, in whole or in part, pursuant to the terms and conditions thereof, or to cancel or suspend a grazing permit or lease for any violation of a grazing regulation or of any term or condition of such grazing permit or lease.

. . . .

(d) Allotment management plan requirements

All permits and leases for domestic livestock grazing issued

_____

[8]FLPMA defines an AMP as a document which "prescribes the manner in, and extent to, which livestock operations will be conducted in order to meet the multiple-use, sustained-yield, economic and other needs and objectives as determined for the lands by the Secretary concerned."  43 U.S.C. § 1702(k)(1).

pursuant to this section may incorporate an allotment management plan developed by the Secretary concerned. . . . Allotment management plans shall be tailored to the specific range condition of the area to be covered by such plan, and shall be reviewed on a periodic basis to determine whether they have been effective in improving the range condition of the lands involved or whether such lands can be better managed under the provisions of subsection (e) of this section. . . .

(e) Omission of allotment management plan requirements and incorporation of appropriate terms and conditions; reexamination of range conditions

*In all cases* where the Secretary concerned has not completed an allotment management plan or determines that an allotment management plan is not necessary for management of livestock operations and will not be prepared, the Secretary concerned *shall* incorporate in grazing permits and leases *such terms and conditions as he deems appropriate* for management of the permitted or leased lands pursuant to applicable law. The Secretary concerned *shall* also specify therein *the numbers of animals to be grazed and the seasons of use and that he may reexamine the condition of the range at any time* and, if he finds on re-examination that the condition of the range requires adjustment in the amount or other aspect of grazing use, that the permittee or lessee shall adjust his use to the extent the Secretary concerned deems necessary. Such readjustment shall be put into full force and effect on the date specified by the Secretary concerned.

Id. § 1752 (emphasis added).

As the statutory language makes clear, FLPMA unambiguously authorizes

the Secretary to specify terms and conditions in livestock grazing permits in

accordance with land use plans. Indeed, all livestock grazing permits are

*required* either to incorporate an AMP or directly to specify the numbers of

animals that may be grazed and the seasons of use. The overarching goal of the

-35-

statute is to ensure that the Secretary's management of the lands is consistent with the principles of multiple use and sustained yield as developed in land use plans. See Natural Resources Defense Council, 618 F.Supp. at 875 (noting the "legislature's emphasis on the importance of land use planning caused the leading commentator to observe that Congress 'intended planning to be the centerpiece of future rangeland management' and 'binding on all subsequent multiple use decisions.'") (quoting Coggins, supra, at 15)). The statute itself simply does not support the notion that once a grazing adjudication has been handed down it must be recognized for all time. To the contrary, the statute explicitly states that permits will in most cases be issued for ten years subject to the terms and conditions the Secretary concerned deems appropriate, and expressly provides the Secretary with authority at any time to adjust animal numbers upon reexamination of range conditions. PLC's and the dissent's position is without support in the language of the TGA, fails to acknowledge the Congressional purpose and plain language of FLPMA, and runs contrary to the elemental proposition that "an agency is not required to 'establish rules of conduct to last forever,' but rather 'must be given ample latitude to adapt [its] rules and policies to the demands of changing circumstances'." Rust v. Sullivan, 500 U.S. 173, 186-87 (1991) (internal quotation marks and citations omitted) (quoting Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42

(1983)).[9]

In sum, since the permitted use rule provides that grazing permits shall specify the numbers of stock and seasons of use according to the dictates of applicable land use plans, the rule is easily within the scope of the Secretary's authority under FLPMA so long as it does not conflict with the TGA's requirement that recognized and acknowledged grazing privileges be *adequately* safeguarded, the question to which we now turn.

## C. Adequate Safeguards

In determining whether the 1995 regulations "adequately safeguard" grazing privileges as required by the TGA, see 43 U.S.C. § 315b, we must take particular note of the fact that to succeed on a facial challenge, PLC must demonstrate "that no set of circumstances exists under which the [regulation] would be valid." Reno v. Flores, 507 U.S. at 301 (alteration in original) (quoting Salerno, 481 U.S. at 745). Such a challenge "is, of course, the most difficult challenge to mount successfully," Rust, 500 U.S. at 183 (quoting Salerno, 481

---

[9]In its discussion of whether the permitted use rule is consistent with the governing statutes, the dissent does not mention FLPMA. Dissent at 17-21. The dissent thus fails to explain how permanent recognition of grazing adjudications dating back more than a half century could possibly be consistent with FLPMA's mandate that the Secretary must specify terms and conditions consistent with land use plans in every grazing permit.

U.S. at 745), and the PLC has not done so here.

First, the 1995 regulations provide exactly the same procedural safeguards that obtained under the previous regulations. The TGA requires the Secretary to "provide by appropriate rules and regulations for local hearings on appeals from the decisions of the administrative officer in charge in a manner similar to the procedure in the land department." 43 U.S.C. § 315h. As the Secretary points out, section 315h applies as much to the "permitted use" rule as it did to the previous "grazing preference." The new regulations similarly provide that "[a]ny person whose interest is adversely affected by a final decision of the authorized officer may appeal the decision for the purpose of a hearing before an administrative law judge." 43 C.F.R. § 4160.4 (1995). As such, any change in a privilege assigned through the permit process is safeguarded to the extent that parties aggrieved by the Secretary's decisions have the right to challenge them.

Second, while PLC argues that the permitted use rule will undermine the stability of the livestock industry, protection of which is a stated goal of the TGA, and that this represents a failure by the Secretary to adequately safeguard grazing privileges, this question is not ripe for consideration on a facial challenge. The Secretary argues and the record confirms that DOI believes the new regulation will actually increase stability, both because DOI does not envision yearly changes in land use plans and because elimination of the distinction between

-38-

"active" and "maximum" use provides a more accurate account of the actual grazing capacity of a given allotment from year to year. See Final Rule, 60 Fed. Reg. at 9922-23; id. at 9928, 9931.[10] In any event, both sides' positions are necessarily speculative until the permitted use rule is actually applied.

Because this record provides no basis for the claim that there is no set of circumstances under which the 1995 regulations as they pertain to enforcement of

_____

[10]The Secretary has stated the following with respect to the effect of the permitted use rule on the predictability of grazing use:

> In the absence of a major change in the overall situation and where [land use plan] objectives are being met, changes in permitted use through BLM initiative are unlikely. This provides a high level of security, stability and predictability from year to year.

60 Fed. Reg. 9894, 9922-23 (Feb. 22, 1995).

> Permitted use is not subject to yearly change. Permitted use will be established through the land use planning process, a process which requires data collection and detailed analysis, the completion of appropriate NEPA documentation, and multiple opportunities for public input. Establishing permitted use through this planning process will increase, not decrease, the stability of grazing operations.

Id. at 9928.

> Although in some cases reductions made under this section of the rule may be carried in temporary suspension, the Department does not believe that it serves the best interest of either the rangeland or the operator to continue to carry suspended numbers on a permit, unless there is a realistic expectation that the AUMs can be returned to active livestock use in the foreseeable future.

Id. at 9931.

the permitted use rule can be said to safeguard grazing privileges adequately, Chevron requires us to defer to the Secretary. We therefore hold the permitted use rule is fully within the Secretary's authority under the TGA and FLPMA and reverse the district court's holding to the contrary.

## III.

## TITLE TO PERMANENT RANGE IMPROVEMENTS

In our judgment, the relevant provisions of the TGA and FLPMA permit the Secretary to promulgate the 1995 regulation under which the United States takes title to all future permanent range improvements constructed under cooperative agreements. Contrary to the dissent's assertion, nothing in the statutory language directs where such title must lie. "If a statute is 'silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" Rust, 500 U.S. at 184 (quoting Chevron, 467 U.S. at 842-43). Moreover, although the new rule represents a departure from prior practice, we are convinced the Secretary provided a reasoned basis for the change. See State Farm Mut. Auto. Ins. Co., 463 U.S. at 42.

In evaluating whether the TGA permits the government to assert title to all

permanent improvements, we must once again place the statutory language in the foreground, keeping in mind our duty to defer to the Secretary's interpretation unless it conflicts with an unambiguous statutory mandate. See Chevron, 467 U.S. at 843-44. Here, the Secretary's broad discretion to implement the Act is immediately clear not only from silences in the statute but from its explicit discretionary language. The TGA mandates that the Secretary

> shall make provision for the protection, administration, regulation, and improvement of such grazing districts as may be created under the authority of section 315 of this title, and he shall make such rules and regulations and establish such service, *enter into such cooperative agreements,* and *do any and all things necessary* to accomplish the purposes of this subchapter and to insure the objects of such grazing districts . . . .

43 U.S.C. § 315a. It is apparent from the phrases "*such* rules and regulations," "*such* cooperative agreements," and "*any and all things necessary*," that the means the Secretary may employ to accomplish the purposes of the Act are nearly completely at his discretion.

Most significant for purposes of analyzing the validity of the range improvements rule is section 315c of the TGA, which provides:

> Fences, wells, reservoirs, and other improvements necessary to the care and management of the permitted livestock *may* be constructed on the public lands within such grazing districts *under permit issued by the authority of the Secretary*, *or* under *such cooperative arrangements as the Secretary may approve*. . . . No permit shall be issued which shall entitle the permittee to the use of *such improvements constructed and owned by a prior occupant* until the applicant has paid to such prior occupant the reasonable value of

-41-

such improvements to be determined under rules and regulations of the Secretary of the Interior.

43 U.S.C. § 315c (emphasis added). Under the plain language of section 315c, the Secretary has discretionary authority to decide whether to allow necessary range improvements (e.g., he "may" allow construction). He may issue permits *or* he may authorize construction under "such cooperative agreement" as he "*may approve.*"

With this discretionary statutory language apparently in mind, the Secretary issued the challenged regulation making all permanent range improvements subject to cooperative agreements and providing prospectively that title to these improvements would be in the United States. The regulation provides in relevant part:

> (a) The Bureau of Land Management may enter into a cooperative range improvement agreement with a person, organization, or other government entity for the installation, use, maintenance, and/or modification *of permanent range improvements or rangeland developments to achieve management or resource condition objectives. The cooperative range improvement agreement shall specify how the costs or labor, or both*, shall be divided between the United States and cooperator(s).

43 C.F.R. § 4120.3-2(a) (1995) (emphasis added).

> (b) Subject to valid existing rights, title to permanent range improvements such as fences, wells, and pipelines where authorization is granted after August 21, 1995 shall be in the name of the United States. The authorization for all new permanent water developments such as spring developments, wells, reservoirs, stock tanks, and pipelines shall be through cooperative range improvement

agreements.

Id. § 4120.3-2(b).  These regulations are fully consistent with the discretionary authority to issue range improvement permits accorded the Secretary under the TGA.

The position advanced by the dissent that permittees must be allowed to own improvements they wholly or partially construct because the TGA *unambiguously* requires it is simply incorrect.  The dissent begins its analysis of the statutory language by asserting the TGA unambiguously requires that title to structural improvements constructed and paid for by permittees must be held by the permittees.  Dissent at 24.  The language upon which the dissent relies states that "[n]o permit shall be issued which shall entitle the permittee to the use of such improvements [fences, wells, reservoirs, and other improvements] *constructed and owned by a prior occupant* until the applicant has paid to such prior occupant the reasonable value of such improvements."  43 U.S.C. § 315c (emphasis added).  According to the dissent, "[t]he phrase 'such improvements constructed and owned by a prior occupant' plainly indicates . . . that when a permittee constructs an authorized improvement, he or she holds title to that improvement."  Dissent at 24.

We do not agree that the quoted language unambiguously requires the meaning the dissent attributes to it.  The dissent takes the words "such

-43-

improvements constructed and owned" to unambiguously mean "constructed and [therefore] owned." The statutory language, however, does not mandate this reading, as evidenced by the need to add the word "therefore" to achieve the result the dissent desires. The statute can just as plausibly be construed to say no more than *if* the Secretary allows a permittee *both* to construct *and* own an improvement, the permittee shall be entitled to compensation for its reasonable value upon transfer. Nothing in the unadorned statutory language *requires* the Secretary to allow a permittee to own an improvement he has constructed, although if the Secretary in his discretion allows ownership, the statute requires compensation. While the language at issue may allow the dissent's reading of it, the entire payment provision can also equally be viewed as purely conditional, operative only if the Secretary allows both construction and ownership.

Moreover, an examination of section 1752(g) of FLPMA gives a clear indication that Congress did not view section 315c as necessarily vesting title to improvements constructed by permittees. Section 1752(g) provides:

> Whenever a permit or lease for grazing domestic livestock is canceled in whole or in part, in order to devote the lands covered by the permit or lease to another public purpose, including disposal, the *permittee or lessee shall receive from the United States a reasonable compensation for* the adjusted value, to be determined by the Secretary concerned, of his *interest* in *authorized permanent improvements placed or constructed by the permittee or lessee on lands covered by such permit or lease . . . .*

43 U.S.C. § 1752(g) (emphasis added). Here the permittee has an "interest" in,

rather than ownership of, permanent improvements he constructs. That this provision was even considered necessary in order to ensure that permittees who construct permanent improvements would be compensated upon cancellation of their permits by the United States belies the suggestion that a permittee is considered to own title to an improvement merely because he constructs it.

Previous versions of the regulations refute the claim that "constructed and owned" vests obvious and automatic title. The 1978 regulatons provided that the United States would hold title to all improvements constructed according to cooperative agreements, whereas permittees would hold title to all improvements constructed according to range improvement permits. See 43 C.F.R. §§ 4120.6-2 to -3 (1978). The dissent's construction is, quite simply, not the only one the language supports.[11]

---

[11]The dissent's citation of the district court's order is revealing in this regard. The district court asserted that section four of the Taylor Act "*strongly suggests* that the individual who constructed the improvement should own it." Dissent at 23 (emphasis added). However, even if this were true, a "strong suggestion" is not the same as a statutory mandate that has one, and only one, possible meaning. Furthermore, although the dissent says that we have "insert[ed]" an ambiguity into the statute where none exists, we note that the dissent has made absolutely no effort to explain why the incorporation of the phrase "constructed and owned" necessarily required that permittees have automatic title to improvements placed on federally owned lands that can be constructed in the first instance only if the Secretary chooses to allow it. We do not disagree with the dissent that "Congress expressed its will on the issue at hand." Dissent at 25. However, we are convinced that Congress intended for the Secretary to decide when range improvements should be allowed and that he can decide that the United States should own title to permanent range improvements under his mandate to do "any and all things necessary" to accomplish the TGA's purposes.

In our view, therefore, nothing in the Act precludes the Secretary from requiring that all permanent improvements be constructed under cooperative arrangements and all removable improvements be constructed under permits. The language in section 315c requiring payment for improvements "constructed and owned" by a prior occupant is not rendered meaningless, as the dissent argues, under this regulatory scheme because the provision will still apply to temporary improvements and require a transferee to pay the transferor for such improvements before using them. *See* Dissent at 24. As such, the dissent's interpretation is just that, its own interpretation.[12]

Since the 1995 range improvements rule is based on a permissible interpretation of the TGA, we must defer to the rule unless the government failed to provide a reasoned basis for modifying the previous regulations.

[A]n agency rule would be arbitrary and capricious if the agency has

---

[12]It is worth noting that the regulatory scheme ensures compensation to permittees for their interest in permanent range improvements regardless of who holds title. Section 4120.3-2(b) provides "[a] permittee's or lessee's interest in contributed funds, labor, and materials [to permanent range improvements] will be documented by the Bureau of Land Management to ensure proper credit for the purposes of §§ 4120.3-5 and 4120.3-6(c)." 43 C.F.R. § 4120.3-2(b). Section 4120.3-5 in turn provides that a grazing preference transfer will not be approved "unless the transferee has agreed to compensate the transferor for his/her interest in the authorized improvements within the allotment." Id. § 4120.3-5. Section 4120.3-6(c) likewise provides that when a grazing permit is canceled, "the permittee or lessee shall receive from the United States reasonable compensation for the adjusted value of their interest in authorized permanent improvements placed or constructed by the permittee or lessee on the public lands covered by the concealed permit or lease." Id. § 4120.3-6(c).

relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

State Farm Mut. Auto. Ins. Co., 463 U.S. at 43.

The government provided several explanations for the changes,[13] any one of which would be sufficient to meet this narrow standard of review. The Secretary first asserts that management of permanent improvements according to FLPMA's multiple-use and sustained-yield mandate would be simplified if BLM could avoid having to negotiate with permittees as titleholders to permanent improvements. Given the fact that multiple-use and sustained-yield management is central to FLPMA and requires that the Secretary have considerable administrative flexibility, the Secretary's basis for the change is reasonable. Equally reasonable is BLM's assertion that the change would unify procedures for authorizing

---

[13]Although the 1995 range improvements regulations are a departure from the rules previously in effect, the Secretary is not, as PLC suggests, departing from 61 years of uniform policy with regard to designation of title. As noted above, the 1978 regulations provided that the United States would hold title to all improvements constructed according to cooperative agreements, whereas permittees would hold title to all improvements constructed according to range improvement permits. See C.F.R. §§ 4120.6-2 to -3 (1978). These regulations did not designate which improvements would be constructed under which authorization scheme. Id. Moreover, the 1981 regulations provided that permittees under a range improvement permit "shall have title to *removable* range improvements," not permanent ones. 43 C.F.R. § 4120.6-3(b)(1981). Thus, PLC cannot credibly assert that permittees have always held title to structural improvements which they built and paid for, at least not by way of regulatory mandate.

improvements between BLM and the Forest Service given that many permittees use land administered by both agencies and both agencies have the same goals with respect to ecosystem management so far as consistent with the specific terms of their respective governing statutes. Finally, the new regulation clarifies a confusing overlap in the prior rule, under which certain improvements could fall under the category providing for shared title as well as the category granting full title to the United States.

In view of these justifications and in light of the fact that permittees will continue to receive the identical compensation they received under the prior rule upon cancellation or transfer of a permit, we hold the 1995 range improvements rule valid. See Rust, 500 U.S. at 187.

## IV.

## THE QUALIFICATIONS RULE

We now turn to the Secretary's new qualifications rule. Under the pre-1995 regulations, in order to qualify for a grazing permit, an applicant had to "be engaged in the livestock business," in addition to other requirements. 43 C.F.R. § 4110.1 (1994). The 1995 version of section 4110.1 eliminates that requirement. The district court set this regulation aside, concluding that "Congress intended for

the Taylor Grazing Act to benefit people actually engaged in the livestock

business," 929 F. Supp. at 1445 (citing legislative history), and that "[f]rom the

beginning the Department of Interior consistently granted grazing permits and

leases only to applicants engaged in the livestock business," id. (citing agency

decisions). Because the TGA does not require applicants to be engaged in the

livestock business to qualify for a grazing permit, however, we reverse the district

court's invalidation of this regulation.

Section three of the TGA authorizes the Secretary–

to issue or cause to be issued permits to graze livestock on such
grazing districts to such bona fide settlers, residents, and other stock
owners as under his rules and regulations are entitled to participate in
the use of the range . . . .  Preference shall be given in the issuance
of grazing permits to those within or near a district who are
landowners engaged in the livestock business, bona fide occupants or
settlers, or owners of water or water rights, as may be necessary to
permit the proper use of lands, water or water rights owned,
occupied, or leased by them . . . .

43 U.S.C. § 315b. Where possible, we will give effect to the plain meaning of the

words chosen by Congress. See Bartlett v. Martin Marietta Operations Support,

Inc., 38 F.3d 514, 518 (10th Cir. 1994) ("The court is obliged to give terms their

plain meaning whenever possible."). The language here is absolutely clear.

Contrary to PLC's argument, the statute only requires that the Secretary give

"preference" to "landowners engaged in the livestock business," among others.

While this preference does require the Secretary to consider the applications of

-49-

"landowners engaged in the livestock business" before most other applications, there is not even a colorable argument that this language *requires* the Secretary to issue grazing permits *only* to those engaged in the livestock business.  In fact, landowners engaged in the livestock business are not even the only group entitled to this preferential treatment.  As quoted above, the TGA also includes "bona fide occupants and settlers, and owners of water or water rights" as other groups entitled to the preference.  We refuse to read into the language of the TGA a requirement that does not exist.

PLC asks us to examine the legislative history of the TGA in deciding this issue.  PLC spends several pages in its brief expounding on this history to support its argument that "Congress intended and assumed that only persons in the livestock business, whether local settlers or outsiders, would be able to graze the public lands."  Appellees' Br. at 41.  If Congress intended that only persons in the livestock business should be able to graze the public lands, in the statute itself Congress would have required the Secretary to limit the issuance of permits to that class of applicants.  Courts should not resort to legislative history in order to ascertain Congress's intent when the plain language of the statute is unambiguous.  See United States v. Gonzales, 117 S. Ct. 1032, 1035 (1997) ("Given [a] straightforward statutory command, there is no reason to resort to legislative history."); see also Bank One Chicago v. Midwest Bank & Trust Co.,

116 S. Ct. 637, 645 (1996) (Scalia, J., concurring) ("The law is what the law says, and we should content ourselves with reading it rather than psychoanalyzing those who enacted it."). We therefore do not consider the legislative history of the TGA on this issue.

PLC also asserts that the Secretary's removal of the "engaged in the livestock business" requirement must be supported by a "reasoned analysis" because it rejects 61 years of DOI interpretation of the TGA. When an agency departs from a prior interpretation of a statute that it is charged with implementing, the agency must justify the change of interpretation with a "'reasoned analysis.'" See Rust, 500 U.S. at 187 (quoting Motor Vehicle Mfrs. Assoc. v. State Farm, 463 U.S. 29, 42 (1983)). However, we need not decide whether reasoned analysis supports the agency's change where, as in this case, we determine that the statutory language at issue is unambiguous and that it suppports the new regulation. See Chevron, 467 U.S. at 842 ("If the intent of Congress is clear, that is the end of the matter . . . ."); cf. Rust, 500 U.S. at 184, 187 (engaging in reasoned analysis discussion only after concluding that the plain language of the statute at issue was ambiguous). In such a case, the agency is simply "giv[ing] effect to the unambiguously expressed intent of Congress," Chevron, 467 U.S. at 843, and we do not reach the second step of Chevron (i.e., determining whether the regulation is based on a permissible construction of the

statute).  In the TGA, Congress only gives "landowners engaged in the livestock business" a preference in the issuance of permits.  43 U.S.C. § 315b.  It does not require the Secretary to issue permits exclusively to such applicants.  The Secretary's revised qualifications rule gives proper effect to this unambiguous statutory language and is not contrary to any statutory requirement.

## V.

## THE CONSERVATION USE RULE

Next, we examine whether the Secretary exceeded statutory authority by allowing the issuance of ten-year permits to use public lands for conservation purposes to the exclusion of livestock grazing.  If no set of circumstances exists under which the regulation would be a valid exercise of the Secretary's authority, we must strike down the regulation as invalid on its face.  See 5 U.S.C. § 706(2)(C); Salerno, 481 U.S. at 745.

Section three of the TGA authorizes the Secretary "to issue or cause to be issued permits to graze livestock" on the public lands.  43 U.S.C. § 315b.  In the 1995 regulations, the Secretary has authorized the issuance of grazing permits or leases for "livestock grazing, suspended use, and conservation use."  43 C.F.R. § 4130.2(a) (1995).  Conservation use, in turn, is defined as "an activity, *excluding*

-52-

*livestock grazing,* on all or a portion of an allotment" for conservation purposes. 43 C.F.R. § 4100.0-5 (1995) (emphasis added). Thus, the Secretary has authorized the issuance of a grazing permit to an individual or group who will not graze livestock for the entire duration of a permit.

The Secretary makes several arguments in support of the new regulation allowing "conservation use" permits. First, he points out (and PLC agrees) that resting land is a perfectly acceptable practice on the public range and is done with regularity in order to prevent permanent destruction of the lands. Indeed, under the pre-1995 regulations, active use could "be suspended in whole or in part on a temporary basis due to drought, fire, or other natural causes, or to facilitate installation, maintenance, or modification of range improvements." 43 C.F.R. § 4110.3-2(a) (1994). The Secretary asserts that the issuance of grazing permits for conservation use merely reflects "a longstanding grazing management practice consistent with the resumption of grazing."

The Secretary further argues that the issuance of permits for conservation use is authorized by the TGA, FLPMA, and PRIA. The Secretary points to section two of the TGA, which provides, "The Secretary shall . . . do any and all things necessary to accomplish the purposes of this [Act]." 43 U.S.C. § 315a. One of the purposes of the TGA is "to preserve the land and its resources from destruction or unnecesary injury." Id. The Secretary asserts that issuance of

permits authorizing conservation use is fully consistent with this mandate. Moreover, FLPMA charges the Secretary with "manag[ing] the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). Multiple use requires that the Secretary consider, among other things, "the long-term needs of future generations for renewable and non-renewable resources." 43 U.S.C. § 1702(c). The Secretary argues that the issuance of conservation use permits helps achieve the goal of multiple use. Similarly, the Secretary contends that conservation use is a mechanism to achieving PRIA's goal of "manag[ing], maintain[ing], and improv[ing] the condition of the public rangelands so they become as feasible as possible for all rangeland values." 43 U.S.C. § 1901(b)(2).

Notwithstanding the reasonable arguments that the Secretary presents, we are not persuaded. The question before us is not whether the Secretary possesses general authority to take conservation measures–which clearly he does–but rather, whether he has authority to take the specific measure in question, i.e., issuing a "grazing permit" that excludes livestock grazing for the entire term of the permit. We conclude at the first step of the <u>Chevron</u> analysis that Congress has spoken directly to this precise question and answered it in the negative.

Our decision rests on the plain language of the relevant statutes. The TGA provides the Secretary with authority to issue "permits to graze livestock on . . . grazing districts." 43 U.S.C. § 315b. That statute does not authorize permits for

-54-

any other type of use of the lands in the grazing districts.  FLPMA and PRIA confirm that grazing permits are intended for grazing purposes only.  Both those statutes define "grazing permit and lease" as "any document authorizing use of public lands . . . *for the purpose of grazing domestic livestock.*"  43 U.S.C. §§ 1702(p), 1902(c) (emphasis added).  Thus, the TGA, FLPMA, and PRIA each unambiguously reflect Congress's intent that the Secretary's authority to issue "grazing permits" be limited to permits issued "for the purpose of grazing domestic livestock."  None of these statutes authorizes permits intended exclusively for "conservation use."  The Secretary's assertion that "grazing permits" for use of land in "grazing districts" need not involve an intent to graze is simply untenable.

The TGA authorizes the Secretary to establish grazing districts comprised of public lands "which in his opinion are chiefly valuable for grazing and raising forage crops."  43 U.S.C. § 315.  When range conditions are such that reductions in grazing are necessary, temporary non-use is appropriate and furthers the preservation goals of the TGA, FLPMA, and PRIA, even when that temporary non-use happens to last the entire duration of the permit.  BLM may impose temporary reductions, see 43 C.F.R. § 4110.3-2 (1994), or permittees may voluntarily reduce their grazing levels.  The presumption is, however, that if and when range conditions improve and more forage becomes available, permissible

-55-

grazing levels will rise.  See, e.g., 43 C.F.R. § 4110.3-1(a) (1994) ("Additional forage temporarily available for livestock grazing use . . . may be apportioned on a nonrenewable basis."); id. § 4110.3-1(b) (providing that additional forage would first be apportioned "in satisfaction of grazing preferences" to permittees authorized to graze in the allotment containing the forage).  The Secretary's new conservation use rule reverses that presumption.  Rather than annually evaluating range conditions to determine whether grazing levels should increase or decrease, as is done with temporary non-use, the Secretary's conservation use rule authorizes placement of land in non-use for the entire duration of a permit.  This is an impermissible exercise of the Secretary's authority under section three of the TGA because land that he has designated as "chiefly valuable for grazing livestock" will be completely excluded from grazing use even though range conditions could be good enough to support grazing.  Congress intended that once the Secretary established a grazing district under the TGA, the primary use of that land should be grazing.

Thus, when the Secretary issues a permit under section three of the TGA, the primary purpose of the permit must be grazing.  If range conditions indicate that some land needs to be rested, the Secretary may place that land in non-use on a temporary basis, in accordance with Congress's grants of authority that the Secretary manage the public lands "in a manner that will protect the quality of

scientific, scenic, historical, ecological, environmental, [and other] values," 43 U.S.C. § 1701(a)(8), or he may reduce grazing on that land, see 43 C.F.R. § 4110.3-2 (1994) (providing that active use may be temporarily suspended in whole or in part for various reasons); id. § 4110.3-3 (describing procedures for implementing changes in active use). The Secretary may also employ other means to ensure that the resources of the public range are preserved. See, e.g., 43 U.S.C. § 1752(d) (stating that grazing permits may incorporate an allotment management plan); id. § 1702(k) (defining allotment management plan as a document which "prescribes the manner in, and extent to, which livestock operations will be conducted in order to meet the multiple-use, sustained-yield, and other needs and objectives" of the land).

In short, it is true that the TGA, FLPMA, and PRIA, give the Secretary very broad authority to manage the public lands, including the authority to ensure that range resources are preserved. Permissible ends such as conservation, however, do not justify unauthorized means. We hold that the Secretary lacks the statutory authority to issue grazing permits intended exclusively for conservation use. Because there is no set of circumstances under which the Secretary could issue such a permit, the new conservation use regulation is invalid on its face. See 5 U.S.C. § 726(2)(c); Salerno, 481 U.S. at 745.

-57-

# VI.

## CONCLUSION

An examination of the statutes Congress has enacted to guide administration of the range land at issue in this case makes it abundantly clear that Congress intended the federal lands to be managed in such a way as to maximize their use for many purposes. There can be no doubt that Congress has vested the Secretary of the Interior with broad authority to decide entitlement to the grazing rights on the range as long as he does not exercise it contrary to clear Congressional mandates. Having considered Congressional intent as expressed in the TGA, FLPMA and PRIA and our deferential role as a reviewing court, we **REVERSE** the district court's invalidation of the permitted use rule, the range improvements rule, and the qualifications rule, and we **AFFIRM** the district court's invalidation of the conservation use rule.

96-8083, Public Lands Council, et al., v. Babbitt

**TACHA** , Circuit Judge, dissenting.

I dissent from parts II and III of the majority opinion.

I.      Permitted Use Rule

With respect to the new permitted use rule, I fundamentally disagree with the majority on the meaning and importance of the statutory command that "[s]o far as consistent with the purposes and provisions of [the Taylor Grazing Act], *grazing privileges recognized and acknowledged shall be adequately safeguarded* . . . ."  43 U.S.C. § 315b (emphasis added).  In my judgment, this statutory command requires the Secretary to continue to recognize permittees' adjudicated grazing levels, called the "grazing preference" in the pre-1995 regulations.  The majority does not accord the statutory language much, if any, importance, and finds it to be ambiguous at best, meaningless at worst.  The majority also concludes, I think erroneously, that adjudicated grazing levels have not been "'recognized' under any regulations promulgated since the enactment of FLPMA" in 1977.  Maj. op. at 28.

This issue is a highly complicated issue to review because it is virtually impossible to adequately understand the mechanics of grazing on the public range and how it is administered from a reading of the relevant regulations.  Even upon reading the briefs, cited authorities, BLM decisions, and scholarly commentaries on the public lands, one is left with a rather incomplete comprehension of the

system. Nevertheless, as thorough an understanding as possible of how the grazing preference system has worked since its inception in 1934 is essential for our proper review.

A.    Historical Role of the Grazing Preference

At the time the TGA was passed in 1934, there were many more applicants for grazing privileges than could be accommodated, a fact that Congress knew. See H.R. REP. NO. 73-903, at 1 (1934) (stating that the public lands "are now being used without supervision or regulation, and there is constant competition among the various users who desire to obtain exclusive benefit of the forage growth."). Congress charged the Secretary with fairly and orderly allocating grazing privileges on the public lands. It was clear that whatever system the Secretary installed would result in recognizing privileges for certain applicants to graze on the public lands while denying privileges to other applicants. To guide the Secretary in this process, Congress articulated which groups were to receive first priority in the distribution of permits. See 43 U.S.C. § 315b ("Preference shall be given in the issuance of grazing permits to those within or near a district who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights . . . ."). The Secretary must engage in that process even today when new lands become open for grazing. See, e.g., Webster v. BLM, 97 I.B.L.A. 1 (1987) (reviewing grazing application regarding

lands that came under BLM control in 1984).

Following the TGA's passage in 1934, the Secretary began the lengthy adjudicatory process of allocating grazing privileges. That process took many years to complete. When the Secretary made a favorable decision on a grazing application, he (1) issued a permit to the applicant, (2) identified the property owned by the permittee that was to serve as the base for the livestock operation and to which the grazing privileges attached, and (3) identified the maximum amount of forage, expressed in AUMs, that the permittee could graze on the public lands. Cf. Federal Range Code, § 6(b) (1938) (describing priority of issuance of grazing permits to qualified applicants). That maximum amount of forage eventually became known as the grazing preference, although that term was not added to the grazing regulations until 1978. See 43 C.F.R. § 4100.0-5(o) (1978).

The grazing preference, or the historically adjudicated grazing level, was distinct from the permit to graze. The permit was the ten-year license granted to the applicant, giving him the right to graze livestock on the public range up to the amount of forage allocated by the Secretary. The grazing preference was the Secretary's maximum allocation of forage to the individual permittee and was in most cases, if established prior to 1978 (as most preferences were), based on either the permittee's historical use of public range or the historically available

forage on the permittee's private lands, whichever was lower. See McLean v. BLM, 133 IBLA 225, 231-32 & nn. 9-10 (1995). There is no question that FLPMA and the 1978 regulations altered the criteria for awarding new preferences and increasing already-existing preferences, see id. at 235, but there is also no question, contrary to the majority's assertion, that the 1978 regulations continued to recognize already-existing grazing preferences, see 43 Fed. Reg. 29,058 (July 5, 1978) (stating that permittees' "adjudicated grazing use, their base properties, and their areas of use (allotments) will be recognized under these grazing regulations.").

The grazing preference never guaranteed a permittee the right to graze that amount of forage every year. Rather, the grazing preference represented the upper limit of forage that the permittee could graze if enough forage were available. Under the 1978 regulations, a permittee's grazing preference included both "active use" and "suspended use." 43 C.F.R. § 4110.2-2(a) (1994). A permittee's active use could fluctuate over time based on available forage and the carrying capacity of the land. Active use could be reduced if grazing was causing an "unacceptable level or pattern of utilization or exceed[ed] the livestock carrying capacity," id. § 4110.3-2(b), and could be suspended in whole or in part on a temporary basis due to drought, fire, or other natural causes, or to facilitate range improvements, see id. § 4110.3-2(a). Similarly, should additional forage

-4-

become available, a permittee's active use could increase up to the amount of the grazing preference. Id. § 4110.3-1(a),(b). In short, the grazing preference represented the upper limit that a permittee could graze if optimal conditions prevailed, all relevant land could be placed in active use, and the Secretary allowed him or her to graze up to that upper limit.

Under the 1978 regulations, the Secretary could change the maximum amount of forage represented by the grazing preference on a case-by-case basis. See 43 C.F.R. § 4110.3 (1994); Gordon v. BLM, 140 IBLA 112 (1997) (addressing BLM's 1992 decision to reduce grazing preference of permittee who, according to BLM, had lost control of his base property). A decision by the authorized officer to change a permittee's grazing preference had to be supported by rangeland studies conducted over time, unless the change was "either specified in an applicable land use plan or necessary to manage, maintain or improve rangeland productivity." 43 C.F.R. § 4110.3 (1994); see also id. § 4110.4-2 (providing for cancellation or suspension of grazing preference upon decrease in public land acreage available for grazing). Thus, under the prior regulations, changes in a grazing preference were based either on the individual circumstances of a particular permittee—e.g., in response to a change in the permittee's control over the base property—or on the condition of particular grazing allotments—e.g., if a reduction in grazing was necessary to improve rangeland productivity.

The grazing preference served as a stabilizing force for the livestock industry and promoted orderly use of the range by guaranteeing permittees the right to graze a predictable number of stock on the public lands and by allowing them to gauge how large or small their livestock operations could be. Stabilization of the livestock industry and promoting orderly use of the range were two of the primary purposes of the TGA. See TGA preamble, 48 Stat. 1269 (uncodified). Possession of a grazing preference attached to qualified base property guaranteed a rancher in possession of a permit the right to graze forage up to the amount specified by the preference so long as forage was available. The fact that a permittee's authorized active use might differ from the total forage in the grazing preference did not remove the certainty that accompanied the preference. Permittees knew and understood that there would be year-to-year fluctuations in available forage and changes in the overall conditions of the range, and the Secretary had full authority under the TGA to make individual adjustments in active use. See 43 U.S.C. § 315b (providing that the Secretary "shall specify from time to time numbers of stock and seasons of use."). Nonetheless, the grazing preference guaranteed permittees a right to graze from year to year those amounts of forage that the Secretary actually authorized and provided them with the certainty that if forage were abundant, grazing up to their preference limit would be authorized.

-6-

Despite annual fluctuations in active use, the preference level generally remained the same from year-to-year, through transfers of the base property, and from permit-to-permit, though there is no question that the Secretary could also effect changes in preference levels as described above. Such authority to change preference levels was in accord with section three of the TGA, which gives the Secretary the authority to "specify from time to time numbers of stock and seasons of use." 43 U.S.C. §315b. At the end of the permit's term, if the Secretary renewed the permit, the permittee again had the right to graze on the public lands in accordance with the grazing preference. Thus, the grazing preference remained in place not just from year-to-year within the ten-year term of the permit, but also from permit-to-permit. Grazing preferences could be transferred from one qualified permittee to another qualified permittee, and they were often pledged as security for loans taken out by permittees.

Based on my historical understanding of grazing preferences and the importance that they assumed in the operation of permittees' livestock businesses, I can only conclude that these adjudicated grazing levels, whether referred to by the label "grazing preference" or by any other name, were an essential part of the permittees' grazing privileges. Section three of the TGA gives permittees a preferential right of renewal of their permits; in my judgment, the adjudicated grazing levels are part and parcel of that preferential renewal right. In making the

grazing decisions, the Secretary determined that certain permittees were entitled to priority in the issuance of permits and that, based on their historic use of the range, they were entitled to graze up to a quantifiable level of forage. When the Secretary reviewed grazing permits for renewal, he was guided by the original adjudications in which he had determined that the permittee was a preferred applicant and in which he identified the maximum forage level that the permittee was entitled to graze.

The Secretary issued those individualized adjudications after engaging in a long process of collecting data, reviewing applications, accepting the recommendations of local grazing advisory boards, and determining whether the applicant was entitled to priority in the issuance of a permit. In issuing grazing decisions, the specific allocation of forage was recorded in the Secretary's logs. The Secretary undertook that process to satisfy its statutory obligation to issue grazing permits according to the priorities articulated by Congress in section three of the statute. The Secretary particularized each grazing decision to the individual permittee. Since the issuance of those original grazing decisions, changes to the grazing preferences have occurred on a case-by-case basis, subject to the Secretary's detailed regulatory requirements. See 43 C.F.R. § 4110.3 (1994) (describing process for making changes in grazing preference status); Miller v. BLM, 118 IBLA 354 (affirming Secretary's denial of increases in

-8-

permittees' grazing preferences).  I conclude that those grazing adjudications are an integral part of permittees' grazing privileges.

B.     Grazing Adjudications Continued in 1978 Regulations

At least two statements from the majority's opinion demonstrate that we clearly do not share the same understanding of the issue before us today, particularly regarding the nature and role of the grazing adjudications.  In discussing FLPMA and the 1978 regulations promulgated thereafter, the majority states that "[w]hile the previously adjudicated grazing uses were to be recognized *for the length of existing permits*, 'future adjudications of grazing use would be based on criteria vastly different than those provided in the Federal Range Code.'"  Maj. Op. at 22 (quoting Interior Board of Land Appeals decision, McLean v. BLM, 133 IBLA 225 (1995)).   The majority also states that "[n]owhere in the 1978 regulations was there any requirement, or even the suggestion, that the authorizing officer must recognize or refer to the original grazing adjudications, *or even the most recent adjudications*, in issuing new permits."  Maj. Op. at 24 (emphasis added).  The italicized portions, in particular, demonstrate that the majority thinks that under the new regulations, each time a ten-year permit is renewed, the Secretary somehow engages in a new "adjudication."

As I understand it, this has never been the case, as the discussion above

indicates. Rather, a grazing adjudication was a one-time decision of the Secretary, made when he first allocated grazing privileges on a particular allotment of the public range. Historically, there were many more applicants for use of the range than could be accommodated, so the Secretary had to grant grazing privileges to some and deny privileges to others. The adjudicatory process of allocating those privileges took nearly two decades. Thereafter, the Secretary engaged in that same type of adjudicatory process only when new public lands became available for grazing. In determining which applicants were to receive grazing privileges, the Secretary determined whether the applicant was a member of a preferred group listed in section three of the TGA, and evaluated the amount of forage on the public lands the applicant had typically used. Then, the Secretary issued a decision, issuing a grazing permit *and also* declaring the maximum level of forage the permittee could graze (i.e., the grazing preference). When a permit came up for renewal, the Secretary either renewed the permit in accordance with the grazing preference, or he denied the permit. Based on my understanding of this system, I can only conclude that the historically adjudicated grazing preference is an integral aspect of a permittee's grazing privileges, and in particular the "preference right of the permittees to renewal" of their permits, referred to in section three of the TGA.

I agree with the majority that passage of FLPMA and the 1978 regulations

drastically changed the criteria that were to guide the Secretary in future adjudications. Indeed, the majority cites an Interior Board of Land Appeals decision that makes that point convincingly. See Maj. Op. at 22 (quoting McLean,133 IBLA at 233). The majority, however, simply does not understand what that means. A "future adjudication," as that phrase was used in the McLean decision, does not refer to the renewal of a grazing permit, as the majority asserts, nor to future decisions by the Secretary respecting allotments on public lands already under BLM control and with respect to which an adjudication has already occurred. Rather, a "future adjudication" is a post-1978 decision made by the Secretary to allocate permanent grazing privileges to various applicants when *new* lands come under BLM control and become available for grazing. McLean v. BLM illustrates well my point. There, the appellants had applied for a substantial increase in their active use in an allotment in which additional forage had become available for grazing. See McLean, 133 IBLA at 226. That allotment was under BLM control and was already open to grazing. Thus, the Secretary had already allocated grazing privileges on that land and adjudicated maximum grazing levels. Because the appellants were already making full use of their grazing preference in the allotment, their request was denied. In accordance with the 1978 regulations, the BLM Area Manager then allocated the newly available forage in the allotment to other permittees who were not making full use of their grazing preferences.

The Area Manager's decision to increase those permittees' active use was not an "adjudication." Rather, the Area Manager increased the other permittees' active use up to their fully authorized and previously adjudicated grazing levels (i.e., their grazing preferences). Those grazing preferences had been determined in a prior grazing adjudication. Indeed, the McLean case makes clear that the appellants' grazing preference dated from an adjudication that occurred at least no later than 1970, and more likely well before that. See id. at 227. The McLean case also makes clear that a "future adjudication" (i.e., a post-1978 adjudication) only occurs when completely new land comes within BLM control, and numerous applicants vie for the right to graze that land. In McLean, new land had not become available; rather, land already under BLM control and open to grazing saw increased levels of forage. The Secretary did not engage in a new adjudication to allocate that forage, but instead increased the active use of those permittees already with grazing privileges in that allotment in proportion to the preference levels previously adjudicated.

The McLean decision makes clear that most permittees' grazing preferences arose in pre-1978 grazing adjudications since most BLM land was opened to grazing immediately following the TGA's passage in 1934. Some grazing preferences derived from post-1978 adjudications, when new land became available for grazing. In either case, however, the only difference is the criteria

-12-

that guided the Secretary in allocating the grazing privileges. Both sets of grazing preferences derived from grazing adjudications and were individualized to particular permittees. An original grazing decision awarded forage use according to a particular permittee's application for a grazing permit. If a permittee's grazing permit were renewed at the end of the life of the permit, the adjudicated grazing preference generally continued unchanged in that new permit. In most cases, recognition of the results of the original grazing decisions continued up to the 1995 revisions. See, e.g., Ortiz v. BLM, 126 I.B.L.A. 8, 9 (1993) (discussing permittee's grazing preference which, despite numerous transfers, "dates from the early 1930s," when it was issued to the original applicant). In the time since BLM issued an original grazing decision, changes in grazing preferences have been individualized, based on the circumstances of particular permittees and the condition of particular grazing allotments. Thus, until the 1995 regulations, the Secretary had safeguarded the results of the original grazing adjudications through continued recognition of the original grazing preference.

C. Effect of the Secretary's New "Permitted Use" Regulation

The Secretary's new permitted use rule ends the long-standing DOI recognition of the adjudicated levels of grazing known as the grazing preference. The Secretary argues that "AUMs are protected and not eliminated under the new

-13-

rules, and the language in the new term 'permitted use' . . . does not effect a substantive change from the previous regulation." Appellant's Br. at 20 (emphasis in original). The Secretary does not acknowledge that the new regulations end recognition of the adjudicated grazing preference. Rather, the Secretary asserts that the new permitted use "encompasses all of the essential elements of the prior term [i.e., grazing preference]." Id.

The pre-1995 "grazing preference" was defined as the "total number of [AUMs] of livestock grazing on public lands apportioned and attached to base property owned or controlled by a permittee or lessee." 43 C.F.R. § 4100.0-5 (1994). Under this regulation, the number of AUMs "apportioned and attached" to the permittee's base property was the number of AUMs allocated to the permittee (or her predecessor) by an individual grazing adjudication. See McLean v. BLM, 133 I.B.L.A. 225, 232-33 & n.12 (1995) (noting that while 1978 regulations drastically changed grazing preference system, new system continued to recognize individual adjudications made prior to 1978); see also 43 Fed. Reg. 29,058 (July 5, 1978) (addressing permittees' concerns about post-1978 regulatory scheme and stating that permittees' "adjudicated grazing use . . . will be recognized under these grazing regulations") (quoted in McLean, 133 I.B.L.A. at 233).

The "permitted use" introduced in the 1995 regulations is defined as "the

-14-

forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease and . . . expressed in AUMs." 43 C.F.R. § 4100.0-5 (1995). Unlike the old "grazing preference," the "permitted use" no longer refers to the number of AUMs determined by individual grazing adjudications. The Secretary's own interpretation of the permitted use rule makes this clear.

> *Grazing preference* is redefined to mean the priority to have a Federal permit or lease for a public land grazing allotment that is attached to base property owned or controlled by a permittee . . . . *The definition omits reference to a specified quantity of forage, a practice that was adopted . . . during the adjudication of grazing privileges. . . .* BLM will identify the amount of grazing use (AUMs), consistent with land use plans, in grazing use authorizations to be issued under a . . . permit.
> . . . .
> A definition of *Permitted use* is added to define the amount of forage in an allotment that is allocated for livestock grazing and authorized for use . . . under a grazing permit. . . . The term replaces the AUMs of forage use previously associated with grazing preference.

60 Fed. Reg. at 9921 (emphasis added); see also id. at 9922-23 ("The objectives set in the [land use] plan are refined in the permit . . . , and permitted use is then expressed in AUMs of active use . . . , as well as suspended use and temporary nonuse during a particular time period."). The majority never squarely addresses whether the new regulations end recognition of the original adjudications because it concludes that the adjudications have not been recognized under any regulations since the enactment of FLPMA in 1977. See Maj. Op. at 28. I refer to my above

-15-

discussion in section I.B of this dissent to make the point that the adjudications were indeed recognized until the 1995 regulations.

Under the permitted use rule, the maximum amount of forage that a permittee can graze is established solely by a land use plan adopted by the BLM, with no reference to the results of the grazing adjudications. By contrast with the old system, the new permitted use approach ends recognition of the grazing preference across the board, for all permittees, without reference either to their individual circumstances or to the condition of the land covered by their permits. Under the new regulations, a permittee's grazing privileges consist of the right to use the AUMs specified in the grazing permit for a ten-year term and a bald right to preference at renewal time. Gone is recognition of the underlying adjudication in which the Secretary made a determination that, vis-a-vis other applicants, the permittee was a member of a priority group entitled to graze up to a maximum amount of forage on a particular allotment, and to which the Secretary previously always referred in renewing grazing permits.

There is no guarantee that the permittee will be allowed to graze predictable amounts of forage upon renewal, nor that the permittee's priority position is secure. I think this difference is significant, for it erases the certainty and predictability that existed under the pre-1995 regulatory scheme and that I am certain was required by Congress under the TGA. The result is that the agency

has nearly unfettered discretion to collectively increase or decrease permittees' maximum allowed forage use without reference to the individual grazing decisions laboriously adjudicated by the Secretary following passage of the TGA.

D.    Statutory Mandate

The dispositive question at issue regarding the new permitted use rule is whether the Secretary's elimination of adjudicated grazing preferences conflicts with Congress's mandate that "grazing privileges recognized and acknowledged shall be adequately safeguarded." To answer this question, Chevron requires us to ask whether that mandate is an unambiguous expression of Congressional policy, for if it is, the courts, "as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843 (1984).

In examining this language, we assume that the words chosen by Congress are employed in their ordinary sense and accurately express Congress's legislative purpose. See FMC Corp. v. Holliday, 498 U.S. 52, 57 (1990). The words "grazing privileges" are straightforward. In the context of the TGA, a grazing privilege is the legislatively authorized right to use an allotment of the public lands for grazing livestock under terms set by the Secretary. See 43 U.S.C. § 315b. What then, is a "recognized and acknowledged" grazing privilege? In the context of the TGA, it seems to me, the answer to that question is also

straightforward. With its delineations of groups that are to receive first priority in the distribution of permits, section three of the TGA envisions the Secretary's undertaking an adjudicatory process in order to fairly and orderly allocate grazing privileges on the public lands. See 43 U.S.C. § 315b ("Preference shall be given in the issuance of grazing permits to those within or near a district who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights . . . .").

I would hold that the phrase "grazing privileges recognized and acknowledged" unambiguously refers to the grazing privileges that Congress charged the Secretary with allocating in section three of the TGA, including the adjudicated grazing levels. The Secretary allocated these privileges to qualified applicants through a detailed adjudication process that took many years to complete. Although Congress did not specify the exact system to be used beyond the initial preferences set forth in section three of the Act, it knew that such an adjudicatory process was necessary in order to identify those livestock operators who should be able to use the public range for grazing.

Similarly, I would conclude that use of the term "adequately safeguarded" is an unambiguous expression of Congress's intent that the Secretary protect the grazing privileges that are recognized and acknowledged by the adjudication process undertaken following passage of the TGA. To safeguard means to protect

-18-

or defend. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981). Even though the modifier "adequately" is necessarily ambiguous, and what constitutes an adequate safeguard rests with the discretion of Secretary, the Secretary cannot altogether abandon his obligation to safeguard recognized grazing privileges. I do not question the authority of the Secretary to revoke a grazing permit because of a permittee's failure to comply with the terms and conditions of the permit or the grazing regulations. See 43 U.S.C. § 1752(a). So long as grazing privileges are unrevoked, however, the Secretary may not interfere with their exercise. See, e.g., Oman, 179 F.2d at 742 (noting that Secretary has "affirmative obligation" to safeguard grazing privileges).

There are at least two well-settled aspects to the Secretary's obligation to safeguard grazing privileges. First, the Secretary "must observe statutory preferences and priorities in granting and renewing permits." GEORGE C. COGGINS & ROBERT L. GLICKSMAN, PUBLIC NATURAL RESOURCES LAW § 19.02[1][c] (1997). Second, the Secretary must protect a permittee's allotment from trespasses by competing livestock operators. See id.; Oman v. United States, 179 F.2d 738, 739-742 (10th Cir. 1948) (allowing permittee with exclusive grazing privileges to bring Federal Tort Claims Act against government for failing to prevent other livestock operators from using land covered by permit and noting that Secretary had duty, under TGA, to safeguard plaintiff's grazing privileges

-19-

against such trespass). The question before this Court today is whether the Secretary's duty to safeguard also includes an obligation to continue to recognize the adjudicated grazing levels, embodied in the pre-1995 regulations in the term "grazing preference." The majority does not answer this question because it concludes that even under the prior regulations, the historical grazing adjudications were not recognized. The majority is mistaken on this latter point, however. In failing to even address this question, the majority reveals a lack of understanding of the preference system that had been in place since 1934 and the regulatory scheme that implemented that system.

Congress requires the Secretary to safeguard permittees' recognized and acknowledged grazing privileges. In the permitted use rule, the Secretary has failed to safeguard the results of the grazing adjudications in which permittees' privileges were first recognized and acknowledged. The new permitted use rule, in effect, wipes the slate clean. That permittees will not immediately lose their right to graze on the public lands seems, to me, irrelevant. When the Secretary undertook to allocate privileges to various applicants to graze a particular allotment on of the public range, he made a series of determinations. He determined that the applicant either was or was not a member of a priority group. He determined whether the applicant had made historic use of the range. He determined what level of forage the applicant had used and whether, vis-a-vis all

other applicants, that applicant should be entitled to continue that level of use. Then, he awarded a successful applicant a grazing preference to graze up to a certain amount of forage, not just for the life of the permit, but for as long as the Secretary allowed the permittee to graze on the public lands. The majority's decision upholding the permitted use rule, in my judgment, reads out the central statutory mandate of section three of the Taylor Grazing Act.

I do not deny that the Secretary has full authority to control permittees' use of the range. See 43 U.S.C. § 315b ("[The Secretary] shall specify from time to time numbers of stock and seasons of use."). The Secretary, however, lacks the authority to eliminate recognition of the underlying adjudications upon which permittees' grazing privileges are based and upon which they rely in running their livestock operations. Because the Secretary exceeded his statutory authority under the Taylor Grazing Act by promulgating the new permitted use regulations, I would set aside the regulations that define permitted use without reference to the original grazing adjudications.

II    Title to Range Improvements

I also disagree with the majority's conclusion that section four of the TGA is ambiguous with respect to ownership of rangeland improvements constructed by a permittee on the public lands. The majority concludes that the TGA is ambiguous as to whether permittees who construct improvements should hold

title to those improvements, and therefore the Secretary was within his authority promulgating new 43 C.F.R. § 4120.3-2(b) (1995). That new regulation states that title to *all* permanent range improvements authorized under cooperative agreements after August 21, 1995 shall be in the United States. A cooperative agreement is an agreement between a permittee and the Secretary whereby both parties jointly pay for the construction of a rangeland improvement.

I agree with the PLC that the TGA grants permittees ownership rights in improvements constructed either in whole or in part by the permittee. The following language from section four of the TGA is relevant:

> **Fences, wells, reservoirs, and other improvements; construction; permits; partition fences.**
> Fences, wells, reservoirs, and other improvements necessary to the care and management of the permitted livestock may be constructed on the public lands within such grazing districts under permit issued by the Secretary or under such cooperative arrangement as the Secretary may approve. . . . . No permit shall be issued which shall entitle the permittee to the use of such improvements constructed and owned by a prior occupant until the applicant has paid to such prior occupant the reasonable value of such improvements to be determined under rules and regulations of the Secretary of the Interior.

43 U.S.C. § 315c (emphasis added). Under this provision, a permittee who "construct[s] and own[s]" an improvement on the public lands is entitled to compensation for its value from a subsequent permittee before the subsequent permittee may use the improvement. Id.; cf. 43 U.S.C. § 1752(g) (stating that a permittee is entitled to reasonable compensation from the government for his

-22-

interest in authorized permanent improvements he has constructed if the government cancels his grazing permit). Thus, new 43 C.F.R. 4120.3-2(b), which gives the federal government title to improvements built by a permittee, has significant consequences for permittees: since title to improvements is not in the hands of the permittees who construct them, permittees are not *statutorily* entitled to any compensation from later users.

The district court determined that section four of the Taylor Act "strongly suggests that the individual who constructed the improvement should own it" and, therefore, struck down the Secretary's range improvements rule as "exceed[ing] statutory authority." Public Lands Council v. Babbitt, 929 F. Supp. 1436, 1442-43 (D. Wyo. 1996). The majority disagrees with the district court, concluding that this statutory section gives the government unlimited discretion to determine what improvements, if any, may be both "constructed and owned" by a permittee.

I cannot agree with the assertion that Congress wanted the Secretary to decide whether a permittee should hold title to improvements paid for and constructed by the permittee. In my judgment, the statute is not ambiguous on this point. It is a well-accepted principle that the first step in interpreting a statute is to determine whether the relevant language has a plain meaning with respect to the particular dispute in the case. See Robinson v. Shell Oil Co., 117

-23-

S. Ct. 843, 846 (1997).  The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.  See id.  The phrase "such improvements constructed and owned by a prior occupant" plainly indicates to me that when a permittee constructs an authorized improvement, he or she holds title to that improvement.  In my judgment, the previous version of section 4120.3-2, which shared title between the United States and permittee "in proportion to the actual amount of the respective contribution to the initial construction," was an accurate and appropriate articulation of an unambiguous statutory mandate.  43 C.F.R. § 4120.3-2 (1994).  Permittees acquired title for that portion of any improvement that they were responsible for constructing.

The provision for compensation in section four of the statute supports my reading.  The majority's reading of the statute, together with the Secretary's new regulation, renders that compensation provision meaningless; without title, a permittee is not be entitled to the compensation for which the statute provides.  It is true, as the majority points out, that other regulations still guarantee permittees full compensation for their investments in improvements, even when they do not own those improvements.  See 43 C.F.R. §§ 4120.3-5, 4120.3-6(c) (1995).  The existence of such regulations does not change the analysis, however.  It cannot be doubted that section four of the TGA only *guarantees* compensation if the

permittee *owns* the improvement. Under the Secretary's approach—where the permittee does not own improvements—compensation to the permittee is a discretionary decision by the Secretary; so long as he wishes, by regulation, to compensate permittees, he may do so. Under this approach, however, there would also be no violation of law if the Secretary were later to end the regulatory entitlement to compensation. The majority's equating a statutory entitlement to a discretionary entitlement embodied in a regulation reveals a misunderstanding of administrative law.

My conclusion that the statutory language is unambiguous on who holds title to improvements constructed on the public lands also reveals a great divide between the majority and me on the role that courts have in interpreting statutory language. We ought not examine statutory language so as to needlessly create ambiguities where no such ambiguity exists. Rather, in interpreting a statute, we should begin with a strong presumption that Congress expressed its will on the issue at hand. I disagree with the majority that one must add the word "therefore" to the phrase "constructed and owned" to reach the conclusion that I do. Clearly, one may deconstruct the statutory language as the majority does and insert an ambiguity into it. My common understanding of the statutory language, however, leads me to conclude that Congress thought about the question before us, and unambiguously spoke to it.

Nor do I agree with the majority that "nothing in the statutory language directs where such title must lie." Maj. Op. at 40. That Congress specifically discusses ownership of improvements demonstrates to me that it thoroughly considered that question. The TGA is a statute replete with discretionary language and congressional grants of rulemaking authority. Such discretionary language or rulemaking authority is conspicuously absent on the question of who should hold title to range improvements. That is for good reason. Congress considered the question and spoke precisely to the issue. As I understand the role of the courts, I do not think <u>Chevron</u> gives us license to ignore the plain meaning Congress employed.